UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES P. RILEY, and the BOSTON FIRE FIGHTERS INTERNATIONAL ASSOCIATION OF FIREFIGHTERS, LOCAL 718, | * * * * * * | |
| Plaintiffs, | * * | Civil Action No. 24-cv-11314-ADB |
| v. | * * | |
| CITY OF BOSTON, and PAUL F. BURKE, in his capacity as the Commissioner of the City of Boston, Fire Department, | * * * * * | |
| Defendants. | * * | |

# **MEMORANDUM AND ORDER**

BURROUGHS, D.J.

    Plaintiffs James P. Riley ("Riley") and the Boston Firefighters International Association of Firefighters, Local 718 ("the Union," and, with Riley, "Plaintiffs") bring this action against the City of Boston and Commissioner Paul F. Burke ("Commissioner Burke") both in his individual and official capacities (collectively, "Defendants"). They allege that Defendants violated Plaintiffs' First Amendment rights when Commissioner Burke suspended Riley for sending an email to Boston's Chief of the Streets regarding deteriorating sidewalk conditions outside the fire station. [ECF No. 1 ("Complaint" or "Compl.")]. Now pending before the Court is Defendants' motion to dismiss, [ECF No. 8 ("Mot.")], which is **DENIED.**

I. **BACKGROUND**

The following facts are taken from the Complaint, the factual allegations of which are assumed to be true when considering a motion to dismiss. See Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014). As it may on a motion to dismiss, the Court has also considered "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).

  A. **Factual Background**

Riley is a firefighter for the Boston Fire Department ("BFD"), assigned to "Tower Ladder 10," which is located at 746 Centre Street, Jamaica Plain ("746 Centre Street firehouse"). [Compl. ¶¶ 3, 11, 13]. Prior to his employment as a firefighter, Riley worked at Boston Emergency Medical Services for eleven years and at the Boston City Hospital for a year. [Id. ¶ 35]. At all times relevant to the Complaint, Riley was a member of the Union and held a position on the Union Executive Board, Division 2. [Id. ¶¶ 3, 31]. The Union is the duly certified collective bargaining agent for uniformed firefighters in the City of Boston, and it represents its members regarding the hours, wages, and working conditions of their employment. [Id. ¶ 4].

Beginning in April 2021, Riley and other firefighters assigned to Tower Ladder 10 noticed that the sidewalks in front of the station were unsafe. [Compl. ¶ 14]. Specifically, the handicap ramps were deteriorating and had become uneven, and the concrete apron was broken. [Id. ¶ 14]. Riley and other firefighters expressed their concerns to Captain Michael Moran ("Captain Moran"), the captain assigned to Tower Ladder 10. [Id. ¶¶ 12, 14].

Numerous civilians complained to Riley and the firefighters assigned to the 746 Centre Street firehouse and called the City of Boston's "311 hotline" to request assistance. [Compl. ¶¶ 15, 16]. As relevant here, their complaints included that a nearby resident had fallen outside the firehouse and sustained an injury when she tripped on the sidewalk cracks; baby strollers had become stuck in the sidewalk cracks, with one almost toppling over with a baby inside; young children were falling and scraping their knees due to the broken concrete apron; and multiple residents in wheelchairs had become stuck while attempting to use the deteriorating handicapped ramp. [Id. ¶ 15]. Riley and the other firefighters sent these complaints up the chain of command with no resolution. [Id.].

On or around April 21, 2021, Captain Moran emailed the BFD Facilities Division from his city email requesting repairs to the sidewalk and attaching photographs of the damaged area. [Compl. ¶ 17]. This email did not result in any repairs. [Id. ¶ 18].

On or around February 11, 2022, Captain Moran sent another email to the Facilities Division, again requesting that the sidewalk be repaired. [Compl. ¶ 19]. His email stated that the concrete apron was "becoming a hazard to pedestrians walking by," including to "[people with disabilities] and families pushing a stroller," and he shared an incident from earlier that day "where a stroller almost toppled over." [Id.]. Joanne Callahan from the BFD Facilities Division looped Greg Mullen at R. Mullen Associates into the conversation, requesting a quote for the repair. [Id. ¶ 20]. Mullen responded that he was "on it." [Id. ¶ 21].

On or around March 20, 2022, Captain Moran sent a third email to the BFD Facilities Division, requesting an update and attaching photographs showing that the condition of the sidewalks was worsening. [Compl. ¶ 22]. Mullen responded that he "submitted quotes for 2 options[:] Concrete & asphalt," and he was "waiting on a PO for one of them." [Id. ¶ 23]. That

3

same day, Captain Moran emailed all firefighters assigned to Tower Ladder 10 to notify them that BFD was aware of the sidewalk issue and that several quotes from contractors to fix it were being collected.  [Id. ¶ 24].

On or around June 16, 2022, Captain Moran sent a fourth email to the Facilities Division requesting an update.  [Compl. ¶ 25].  In his email, Captain Moran shared that "a child fell and scraped his knee while walking on the broken concrete apron."  [Id.].  The email did not result in any repairs.  [Id. ¶ 26].

On or about April 20, 2023, Captain Moran sent a fifth email to the Facilities Division requesting an update on the sidewalk and on a separate request for a new generator.  [Compl. ¶ 27].  Director Patrick Lee responded that the requests had "raised concern with the budget department," that the Centre Street firehouse was "among 3 or 4 houses that need new generators and of many that need apron work," and that he was "putting together two packaged projects [to] address both [of] these department-wide issues."  [Id. ¶ 28].  The email exchange did not result in any repairs.  [Id. ¶ 29].

On or about September 26, 2023, Riley sent an email (the "September 26 email") from his union email address to the City of Boston Chief of the Streets Department, Jascha Franklin-Hodge, stating:

> I am writing you to ask for assistance with an ongoing issue in front of the firehouse at 746 Cent[re St.] JP.  The sidewalk and handicapped ramps have been marked up for replacement by the city since the summer of 2022.  To date there have been some hot top placed to help ease the issue but not permanent resolution.  Most if not all of the ramps going down Cent[re St.] were repaired and replaced last summer by the city.
>
> As a firefighter who proudly works in the neighborhood and spends time outside the firehouse interacting with the constituents[,] we are constantly asked when this issue is going to be resolved.  We have no answer and can only direct them to make a 311 complaint.

> I strongly believe [this] is a safety issue for the citizens and guests who walk by here on a regular basis. Is the city going to wait until someone is injured before resolving this public safety issue?
>
> Please see attached photos taken recently for reference.
>
> [T]hanks[,] Jim

[ECF No. 1-10 at 3]; see also [Compl. ¶ 30]. Riley sent the September 26 email in his capacity as an Executive Board Member of the Union and with approval from the Union President Samuel Dillon, "who was concerned about this unaddressed safety issue for both his firefighter membership and the civilians living in the area." [Compl. ¶ 31]. He signed it using a signature block for the Union. [ECF No. 1-10 at 3]. On or about September 26, 2023, Franklin-Hodge responded to Riley's email, stating, "Thank you for the note. We'll look into it." [Compl. ¶ 32]. The next day, Commissioner Burke contacted Franklin-Hodge to ask for a copy of Riley's email. [ECF No. 1-11 at 2; Compl. ¶ 33].

On or about October 11, 2023, the Deputy Chief for BFD's Personnel Division, Christopher Burke ("Deputy Chief Burke," not to be confused with "Commissioner Burke"), issued Riley a notice suspending him for four tours of duty. [Compl. ¶ 34]. Before this, in his sixteen years on the job with BFD, Riley had never been suspended. [Id. ¶ 35]. The notice stated, in relevant part:

> Firefighter James P. Riley . . . sent a hostile email request to a City of Boston department head regarding the condition of the sidewalk and handicapped ramp outside of a firehouse. He used his Local 718 Union title in an attempt to intimidate the City of Boston official into action. He also violated the chain of command by failing to go through the required Boston Fire Department command structure.

[ECF No. 1-12 at 2; Compl. ¶ 34].

On October 30, 2023, following a disciplinary hearing regarding the suspension, Commissioner Burke[1] issued a letter, stating, in relevant part:

> The hearing officer found that the suspension imposed is appropriate[] and recommends that it be upheld.  Specifically, the hearing officer found that you should not have used your Local 718 Union Title to intimidate a City of Boston official and that you violated the chain of command by failing to go through the required BFD Command structure.

[ECF No. 1-13 at 2]; see also [Compl. ¶ 36].  Based on this, Commissioner Burke "accepted the recommendation" and "uph[e]ld the… four [] tour suspension." [ECF No. 1-13 at 3].  The Union then filed a grievance on Riley's behalf appealing the suspension.  [Compl. ¶ 37].

On January 2, 2024, after a final grievance hearing, the city hearing officer sustained the four-tour suspension on the ground that Riley had violated the chain of command.  [Compl. ¶ 38].

### B.     Procedural History

Plaintiffs filed their Complaint on June 10, 2024, [Compl.], which Defendants moved to dismiss on September 6, 2024, [Mot.].  Plaintiffs opposed on October 2, 2024.  [ECF No. 12 ("Opp.")].

## II.    STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff.  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir.

---

[1] The Complaint alleges that "Deputy Chief Burke" issued Riley the October 30, 2023 letter. [Compl. ¶ 36].  The letter, which is attached to the Complaint, was signed by Commissioner Burke.  [ECF No. 1-13 at 3].  Thus, the Court assumes that describing Commissioner Paul Burke as "Deputy Chief" Burke was a typographical error and attributes the letter to Commissioner Burke.

2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)). "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Although detailed factual allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

## III.      DISCUSSION

Plaintiffs each assert a claim under 42 U.S.C. § 1983 against Defendants for alleged violations of their rights under the First Amendment. [Compl. ¶ 39]. Specifically, they claim that Commissioner Burke's actions, while he was acting under the color of law, interfered with their "rights of freedom of speech, assembly, and association." [Id.].

### A.      Riley's First Amendment Claim

The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble, and

to petition the Government for a redress of grievances." U.S. Const. amend. I. As the Supreme Court has explained:

> The First Amendment creates "an open marketplace" in which differing ideas about political, economic, and social issues can compete freely for public acceptance without improper government interference. The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves. And the ability of like-minded individuals to associate for the purpose of expressing commonly held views may not be curtailed.

Knox v. Serv. Emps. Int'l Union, Local 1000, 567 U.S. 298, 309 (2012) (citations omitted).

Public employees do not surrender all of their First Amendment rights by virtue of their employment; "[r]ather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). In some circumstances, however, it may be appropriate for the government as an employer to limit or discipline the speech of a public employee. See id. at 418–19 ("Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." (citing Connick v. Myers, 461 U.S. 138, 143 (1983))).

In consideration of these competing interests—the right of a citizen to speak freely and the need for public employers to operate effectively—the First Circuit has developed a three-part test to determine whether an adverse employment action against a public employee violates his or her First Amendment rights. See Decotiis v. Whittemore, 635 F.3d 22, 29–30 (1st Cir. 2011); Curran v. Cousins, 509 F.3d 36, 44–45 (1st Cir. 2007); Lewis v. City of Bos., 321 F.3d 207, 218–19 (1st Cir. 2003).

> First, a court must determine whether the employee spoke as a citizen on a matter of public concern. Second, the court must balance the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees. Third, the employee must show that the protected

    expression was a substantial or motivating factor in the adverse employment decision. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that it would have reached the same decision even absent the protected conduct.

Decotiis, 635 F.3d at 29–30 (internal quotations and citations omitted).

    Here, Defendants challenge Riley's ability to meet the first and second prongs of the three-part test.[2] They assert that the September 26 email does not constitute protected citizen speech because it was made in Riley's professional capacity as a firefighter or a union representative, and it did not relate to a matter of public concern. See [ECF No. 9 at 8–10]. They further contend that, even if Riley's speech was made as a private citizen on a matter of public concern, his suspension was justified under the second prong's balancing test. [Id. at 11–12]. In the event that Riley's speech is protected, Defendants also assert that his claims must be dismissed because Commissioner Burke has qualified immunity and because he has not sufficiently pled municipal liability. [Id. at 12–16].

                     1.    Citizen Speech on a Matter of Public Concern

    With regard to the first prong, "[t]he Court must first determine whether the speech touched upon a matter of public concern," Decotiis, 635 F.3d at 30, which "is a case-specific, fact-dependent inquiry," Curran, 509 F.3d at 46. A matter of public concern is "any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. In determining whether speech involves a matter of public concern, courts look to "the form and context of the speech, with an eye to (1) 'whether the community has in fact manifested a legitimate concern' in the subject, and (2) whether the employee's speech 'suggests a subjective intent to contribute

---

[2] Defendants do not dispute that Riley's suspension was causally related to the email that he sent to Franklin-Hodge. [ECF No. 9 at 7 n.5].

to . . . public discourse.'" McGunigle v. City of Quincy, 944 F. Supp. 2d 113, 121 (D. Mass. 2013) (quoting O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993)).

If the speech at issue touched upon a matter of public concern, the Court must then determine whether the public employee was speaking as a citizen or, alternatively, speaking "pursuant to [his] official duties." Decotiis, 635 F.3d at 31. To do so, a court should identify "the duties an employee actually is expected to perform" and then ask, "was the speech at issue made pursuant to those responsibilities." Id. at 31–32. This requires "a hard look at the context of the speech," and courts may consider the following non-exclusive factors, none of which are dispositive:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.

Id. at 32 (citations omitted).

Defendants first contend that the September 26 email did not involve a matter of public concern. [ECF No. 9 at 10–11]. Specifically, they argue that the email "did not touch on 'official malfeasance, abuse of office, [or] neglect of duties,'" that "it is doubtful that sidewalk defects constitute a subject about which 'the community' could manifest a 'legitimate concern,'" and that the email did not show a "'subjective intent to contribute to… public discourse.'" [Id. at 11 (first quoting Curran, 509 F.3d at 46; and then quoting McGunigle, 944 F. Supp. 2d at 121)]. Riley counters that Defendants misconstrue the standard; specifically, he contends that while "[c]ertain instances, such as official malfeasance, abuse of office, and neglect of duties, are of 'inherent public concern,'" this is not the end of the inquiry because topics outside of these can

still constitute a public concern depending on the circumstances.[3]  [Opp. at 8 (quoting Curran, 509 F.3d at 46)].  He maintains that the September 26 email was "on a matter of public concern because the defective sidewalks were of legitimate concern to the public and his email implie[d] an intent to contribute to public discourse."  [Id. ].

The Court is more than satisfied that Riley has pled sufficient facts to demonstrate that the ongoing issues with the sidewalk were a matter of public concern.  This, in fact, seems obvious.  The Complaint's factual allegations establish that "[n]umerous civilians complained to Riley and firefighters assigned to the 746 Centre Street firehouse" about the sidewalk, as well as made calls to "the City of Boston 311 hotline."  [Compl. ¶¶ 15–16].  Among these complaints were that several residents including children had fallen and sustained injuries, that baby strollers had gotten stuck or almost toppled over, and that residents in wheelchairs had gotten stuck while attempting to use the handicapped ramp.  [Id. ¶¶ 15, 17, 19].  Despite Defendants' unsupported argument to the contrary,[4] the Court sees no reason why the community could not manifest a

---

[3] Riley also argues that his speech was on an inherent matter of public concern because it related to Franklin-Hodge's "neglect of duties to properly deliver 'high-quality essential city services,' as Captain Moran [had] sent out five emails over the course of more than two years, none of which resulted in any repairs."  [Opp. at 8].  The allegations in the Complaint reflect, however, that the department was aware of the issues with the sidewalk and was working to resolve them, including by contacting contractors for quotes, although the project was ultimately faced with budget constraints.  [Compl. ¶¶ 23, 27–28].  While two years does strike the Court as a long period of time to resolve this issue, in light of these allegations set forth in the Complaint, and because it does not alter the disposition, the Court declines to find that Franklin-Hodge's actions with regard to the sidewalk amount to neglect.  That said, Plaintiffs may revisit this argument should discovery warrant it.

[4] In support of its argument that it is "doubtful" that the community could manifest a legitimate concern in its sidewalks, Defendants cite McGunigle, 944 F. Supp. 2d at 121.  In McGunigle, the Court not only stated in dicta that the community at large had manifested a legitimate concern in the city's alleged "non-enforcement of dog leash and dog waste ordinances" but also held that the allegations, if true, rose to the level of "neglect of duties and non-enforcement of public

legitimate concern in the safety of its sidewalks, particularly where the sidewalk was causing injury and harm to children, the disabled, and the elderly, and the facts as pled indicate that the members of this community had (very reasonably) actually expressed such a concern. Additionally, in the September 26 email, Riley made clear that he was raising the issue in part because, as a firefighter, he was "constantly [being] asked [by constituents] when th[e] issue [was] going to be resolved," and he "strongly believe[d] [that it was] a safety issue for the citizens and guests who walk[ed] by [the firehouse] on a regular basis." [Id. ¶ 30]. Both of these statements evidence his subjective intent to add to this public discourse.

Defendants further argue that, even if Riley spoke on a matter of public concern, he did so as a public employee, rather than as a private citizen. [ECF No. 9 at 8–10]. Specifically, Defendants argue that of the factors that the First Circuit set forth in Decotiis to distinguish speech by a public employee in a professional versus private capacity, "only the first weighs in Riley's favor: he was not commissioned or paid to send the email to Franklin-Hodge." [ECF No. 9 at 8]. Riley responds that, in his view, "all but the third and fourth factors weigh in favor of finding that Riley's speech was not made pursuant to his official duties and that he was speaking in his capacity as a private citizen and resident of Boston." [Opp. at 10].

As the First Circuit has observed, "[n]avigating the shoals of the standard articulated by the Supreme Court in Garcetti v. Ceballos, 547 U.S. 410 (2006), has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific." Decotiis, 635 F.3d at 26. That said, the Court

---

health and safety laws." 944 F. Supp. 2d at 121. The allegations here, which relate to public safety, seem significantly more compelling than the dog issues addressed in that case, making the community concerns here more compelling and certainly not less so.

12

ultimately agrees with Plaintiffs that the Complaint plausibly alleges that Riley was not speaking pursuant to his official duties when he sent the September 26 email. Sending such an email does not appear to have been within Riley's official responsibilities, and the subject matter of the email—namely, escalating concerns regarding a need for sidewalk repair—is not traditionally thought of as within a firefighter's employment duties, nor is it alleged to have been part of Riley's here. In fact, the Complaint, read generously, places this responsibility squarely within Captain Moran's charge, not Riley's. See, e.g., [Compl. ¶¶ 14 (firefighters reported concerns to Captain Moran); 17–24 (Captain Moran escalated concerns to BFD's Facilities Division and reported responses back to firefighters)]; see also Decotiis, 635 F.3d at 31 (inquiry into plaintiff's job responsibilities "is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform'" (quoting Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 26 (1st Cir. 2010)).

Additionally, very little about the content or context of the email, as alleged, indicates that Riley sent it pursuant to any job responsibilities. While Riley did identify himself as a firefighter in the email, he did not include any language to indicate that he was speaking on behalf of BFD or that his email "had the fire department's imprimatur." Decottis, 635 F.3d at 31; see generally [ECF No. 1-11 at 3]. In fact, he signed the email using his Union signature block,[5] and he specifically noted that he was reaching out on behalf of the constituents he was otherwise unable to help. [ECF No. 1-11 at 3]; cf. Foley v. Town of Randolph, 598 F.3d 1, 8

---

[5] While the Court recognizes that using the Union's signature block has the impact of identifying Riley as a firefighter, drawing all reasonable inferences in his favor at the motion to dismiss stage, the Court views the use of the Union signature block as an attempt by Riley to distinguish his role as a firefighter from his role as a Union member, at least arguably diminishing any "imprimatur" of the BFD in the email.

(1st Cir. 2010) (finding context supported that Chief of the Fire Department spoke in his official capacity where he "spoke while in uniform and on duty; he spoke from the scene of a fire where he had been in command as the Chief of the Fire Department; and his comments were bookended by those of another official – the State Fire Marshal").  Moreover, although Riley may have learned that the sidewalks and handicap ramp "ha[d] been marked up for replacement by the city since the summer of 2022" by virtue of his position as a firefighter, [ECF No. 1-11 at 3], the ultimate conclusion that the sidewalk was and had long been in need of repair required no "special knowledge," as evidenced by the fact that the Complaint alleges that several non-firefighter citizens were also engaged in communications with the city to try to fix the problem (which also lends credence to the notion that there is a "citizen analog" to Riley's speech). [Compl. ¶ 16].  On balance, viewing the facts alleged in the light most favorable to Riley, the Complaint alleges facts which "plausibly set forth citizen speech." Decotiis, 635 F.3d at 35.

2. Pickering Balancing Test

Defendants argue alternatively that even if Riley was speaking as a citizen on a matter of public concern, his speech was nevertheless unprotected under the Pickering test.  "The Pickering test attempts to balance the value of an employee's speech—both the employee's own interests and the public's interest in the information the employee seeks to impart—against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Decotiis, 635 F.3d at 35 (internal quotations omitted); see also O'Connor v, 994 F.2d at 915; Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State,

as an employer, in promoting the efficiency of the public services it performs through its employees.").

"While the Pickering balancing inquiry is 'a matter of law for the court to decide,' it is also a 'fact-intensive' inquiry, demanding 'a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke.'" MacRae v. Mattos, 106 F.4th 122, 136 (1st Cir. 2024) (first quoting Bruce v. Worcester Reg'l Transit Auth., 34 F.4th 129, 138 (1st Cir. 2022); then quoting Fabiano v. Hopkins, 352 F.3d 447, 457 (1st Cir. 2003); and finally quoting Decotiis, 635 F.3d at 35). "The government employer's interest must be proportional to the value of the employee's speech; in other words, 'the stronger the First Amendment interests in the speech, the stronger the justification the employer must have.'" Id. (quoting Curran, 509 F.3d at 48). "In assessing the government's interest in allaying disruption and inefficiencies in the workplace, a court should include in its considerations (1) 'the time, place, and manner of the employee's speech,' and (2) 'the employer's motivation in making the adverse employment decision.'" Decotiis, 635 F.3d at 35 (quoting Davignon v. Hodgson, 524 F.3d 91, 104 (1st Cir.2008)).

Defendants contend that Riley's speech is unprotected because "Commissioner Burke was justified in disciplining Riley to uphold the department's standards and ensure a professional and respectful workplace" because "[a]s a department with a paramilitary structure, the BFD has a particular interest in ensuring the integrity of the chain of command," and "[i]t is . . . critical that the department maintain an approval process for communications regarding safety hazards to the public." [ECF No. 9 at 12]. In particular, Defendants assert that "[t]here is no basis in the Complaint for concluding that [Riley's] interest in directly contacting the Chief of Streets

15

outweighs the fire department's interest in providing efficient and effective public safety services." [Id.].

Although it is mindful of BFD's generalized, legitimate interest in maintaining order, Curran, 509 F.3d at 49, the Court "must consider whether the [D]efendants' predictions about the disruption [Riley's] speech would have on their [chain of command] were reasonable." Hussey v. City of Cambridge, No. 21-cv-11868, 2022 WL 6820717, at *6 (D. Mass. Oct. 11, 2022); see also MacRae, 106 F.4th at 138 (defendant need not show actual disruption to order but may instead rely on a reasonable prediction regarding the speech's potential to disrupt). Riley's Complaint does not allege that any actual disruption or harm resulted from the one-time email, nor do the Defendants articulate how Riley's email could have been expected to reasonably cause or in fact did cause any actual disruption to BFD's operations or its chain of command. See generally [Compl.; Mot.]. For instance, the Complaint does not allege that Riley interrupted his own work or anyone else's work to send the email, nor is the Court even sure at this stage where Riley was when he sent the email. As such, at this juncture, Defendants' interests are weak. To conclude otherwise would require the Court to find that a respectful email about a long-standing public safety issue somehow jeopardized the orderly functioning of the fire department.

Weighed against Defendants' conclusory interest is maintaining order is the public's interest in the speech, which, as discussed supra, the Complaint pleads to have been substantial. Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003) ("[T]he greater the value of the subject of the speech to the public, the more the balance tilts towards permitting the employee to express himself."). Additionally, Riley's email indicates that he reached out not because of a personal interest in the sidewalk but rather because he "strongly believe[d] the [sidewalk was] a

safety issue for the citizens and guests" in the neighborhood, [Compl. ¶ 30], which increases the speech's value, see O'Connor, 994 F.2d at 915 (plaintiff's motives for speaking are "properly weighed in the balance under Pickering"). Given the public interest in the speech, Riley's motives for emailing, and the reasonably low probability that the email would disrupt Defendants' operations, the Court finds that Riley's speech, at this stage, easily survives the Pickering balancing test.

### 3. Qualified Immunity

Because Riley has successfully alleged a violation of his First Amendment rights by Commissioner Burke, the Court will briefly address Commissioner Burke's qualified immunity defense. [ECF No. 9 at 12–14]. Qualified immunity protects public officials, in their individual capacity, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

To determine whether a defendant is entitled to qualified immunity, the Court undertakes a two-step inquiry to determine: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 268–69 (1st Cir. 2009) (quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009)). Determining whether a right is "clearly established" is a two-part inquiry. "The first sub-part requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). "The second sub-part asks whether an objectively reasonable official in the

defendant's position would have known that his [or her] conduct violated that rule of law." Id. (citing Wilson v. City of Bos., 421 F.3d 45, 57–58 (1st Cir. 2005)).

Here, as discussed supra, Riley has adequately pled a violation of his First Amendment right to engage in protected speech and to be free from workplace retaliation. See Section III.A.1., supra. Riley's "theory of liability is not so novel that the Court can determine, based on the pleadings alone, that his rights were not 'clearly established' or that a reasonable person would not have been aware of said rights." Stone v. Worcester Cnty. Sheriff's Office, No. 18-cv-10011, 2019 WL 1367768, at *5 (D. Mass. Mar. 26, 2019). Accordingly, the Court denies Commissioner Burke's motion to dismiss to the extent it seeks qualified immunity on the First Amendment claim. Commissioner Burke may raise this defense again when the factual record has been more sufficiently developed.

4. Municipal Liability

Defendants contend that Riley's claims against the City of Boston, the BFD, and Commissioner Burke in his official capacity should be dismissed because Plaintiffs have failed to allege municipal liability consistent with Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).[6] [Opp. at 14–16]. Under Monell, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." 436 U.S. at 691 (emphasis omitted). However, "a municipality . . . may be held liable when" a plaintiff's injury is directly caused by either: (1) a municipal policy or (2) a municipal custom. Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (citing Monell, 436 U.S. at 694).

---

[6] Plaintiffs' claim against Commissioner Burke in his official capacity is properly construed as claims against the City of Boston. Stratton v. City of Bos., 731 F. Supp. 42, 46 (D. Mass. 1989).

Defendants assert that Plaintiffs "allege[] no unconstitutional custom, policy, or practice on the party of the City, nor do they allege sufficient facts to show that they were harmed by the City's enforcement of or adherence to an unconstitutional custom, policy, or practice." [ECF No. 9 at 15]. Plaintiffs concede that "there is no express 'policy statement, ordinance, regulation, or decision' within [] the City of Boston's Fire Department protocols that require the imposition of a chain of command on private speech, and therefore infringe on First Amendment rights." [Opp. at 18]. They contend, however, that their claims should not be dismissed because, in suspending Riley for his speech, Commissioner Burke exercised "final policymaking authority," such that Monell liability is appropriate. [Id. at 17–18].

Plaintiffs are correct that the First Circuit has held that "[o]ne way in which a plaintiff can establish an official policy or custom is by showing that 'a person with final policymaking authority' caused the alleged constitutional injury." Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022). "When determining whether a decisionmaker exercises final authority, courts must look to state law, including valid local ordinances and regulations, for descriptions of the duties and obligations of putative policymakers in the relevant area at issue." Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (cleaned up). While Plaintiffs do not point the Court to specific Massachusetts statutes in their Opposition, the Complaint pleads that Commissioner Burke "is the disciplinary authority for" BFD, [Compl. ¶ 6], and the exhibits attached to the Complaint establish that it was ultimately within Commissioner Burke's authority to either accept or reject Riley's suspension, subject only to an appeal to the Civil Service Commission, [ECF No. 1-13 at 2–3 (referencing Mass. Gen. Laws ch. 31)]; see also Mass. Gen. Laws ch. 31, § 41 (stating that, following a hearing officer's recommendation of an employee's suspension, "the appointing authority shall give to such employee a written notice of his

decision" and that if the appointing authority affirms the action, the employee "may appeal to the commission"); id. § 1 (defining "appointing authority" as "any person, board or commission with power to appoint or employ personnel in civil service positions"). Additionally, there is at least some case law to support the notion that commissioners of Massachusetts state agencies are final decisionmakers for purposes of Monell liability. See, e.g., Fincher, 26 F.4th at 485 (Commissioner of Public Works determined to have final policymaking authority); Dawn v. City of Bos., No. 01-cv-10425, 2002 WL 487161, at *4 (D. Mass. Mar. 29, 2002), vacated sub nom. Dwan v. City of Bos., 329 F.3d 275 (1st Cir. 2003) (police commissioner had final decision-making authority). At this stage, the Court is satisfied that this is enough.[7]

### B. The Union's First Amendment Claim

Defendants assert that "[t]he Union's claims are duplicative of Riley's," and, as such, the Union's First Amendment claim should be dismissed for the same reasons as Riley's. [ECF No. 9 at 16]. Because Riley's claims have not been dismissed, Defendants' motion to dismiss the Union's claims is **DENIED**.

## IV. CONCLUSION

Accordingly, for the reasons sets forth above, Defendants' motion is **DENIED**.

**SO ORDERED.**

April 18, 2025                              /s/ Allison D. Burroughs
                                            ALLISON D. BURROUGHS
                                            U.S. DISTRICT JUDGE

---

[7] That said, the parties should be prepared to address, either at summary judgment or at trial, whether Commissioner Burke did possess final decision-making authority sufficient for Monell liability.