*********************************************
In the Matter of the Arbitration between   *
  *
Boston Firefighters Union, Local 718, IAFF   *     AAA# 01-24-0000-0552
  *     Decision & Award
and   *
  *
City of Boston   *
  *
(Grievance: #09-0658 – 4-Tour Suspension of   *
     Firefighter James Riley)   *
*********************************************

**BEFORE:**     Beth Anne Wolfson, Arbitrator


## APPEARANCES

**For the Union:**     Leah M. Barrault, Esq.
                    Nourhene Chtourou, Esq.

**For the City:**     Robert J. Boyle, Jr., Esq.


## WITNESSES

Rodney Marshall, Chief of Operations Support, Boston Fire Department
Christopher Burke, Deputy Chief for the Personnel Division, Boston Fire Department,
Michael Doherty, Deputy Chief, Division 2, Group 1, Boston Fire Department
James Riley, Grievant


      A hearing in this matter was held on June 12, 2024 and December 19, 2024, in Boston,

Massachusetts, before the undersigned Arbitrator, who was designated by the parties pursuant to

the provisions of their collective bargaining agreement.  The parties were afforded full opportunity

to present evidence and make argument in support of their respective positions.  Both parties

submitted post-hearing briefs, and the hearing was declared closed on March 14, 2025.

## ISSUES

1. Did the City have just cause under Article XVI of the parties' collective bargaining agreement (CBA) when it suspended Firefighter James Riley for 4 tours and issued a letter of reprimand?

2. If not, what shall be the remedy?

## PERTINENT CONTRACT PROVISIONS

### ARTICLE IV
### Management Rights

The City and its Mayor and Fire Commissioner respectively reserve and retain all powers, authority, and prerogatives not expressly abridged, or modified by this Agreement.  Except as expressly provided by this Agreement, neither the City, nor its Mayor nor the Fire Commissioner shall be deemed to be limited in any way by this Agreement in the exercise of the regular and customary functions of municipal management.  The provisions of this Agreement supersede any conflicting or inconsistent rule, regulation or order promulgated by the Fire Commissioner, the City, its agents, officials or representatives.

### ARTICLE XVI
### Grievance Procedure

**Section 1.** A grievance hereunder is defined as any dispute arising out of or concerning the interpretation or application of any provision of this Agreement.

**Section 2.** Grievances shall be processed as follows:

\*\*\*

**Section 5.** The decision of the arbitrator shall be final and binding upon the parties, except that the arbitrator shall make no decision which alters, amends, adds to or detracts from this Agreement, or which recommends a right or relief for any period of time prior to the effective date of this Agreement or which modifies or abridges the rights or prerogatives of municipal management under Article IV of this Agreement. Nothing in this Section shall limit Local 718's right to process grievances arising under an agreement in effect immediately prior to the effective date of this Agreement so long as the time limits set out in that prior Agreement have been satisfied. As to such grievances, an arbitrator shall have remedial authority covering in time periods prior to the effective date of this Agreement.

\*\*\*

**Section 7.**  Employees shall not be disciplined nor discharged except for just cause.  Any dispute relative to discipline or discharge or to matters heretofore within the jurisdiction of any

Retirement Board established by law may be a subject of grievance and arbitration under the terms of this Agreement ....

Jt. Ex. 1

### PERTINENT RULES & REGULATIONS

### RULES & REGULATIONS OF THE
### BOSTON FIRE DEPARTMENT
### JULE 1, 1997

### CHAPTER 18

18.17   A member shall promptly notify his/her immediate superior of any of the following which he has personal knowledge of, or with which he is in any way connected,

  \*\*\*

  b.   Defects in apparatus, equipment, or other department property or damage to same.

\*\*\*

18.19   If a member observes any street or highway condition liable to cause delay or accident to apparatus, or if he knows of any occurrence or condition of affairs which in the public interest should be communicated to another public department, he shall promptly inform his/her immediate superior thereof and such superior shall telephone the information to the District Chief and the public department concerned.  The officer notified shall submit  Form GF65 to the proper authority.

\*\*\*

18.35   Every person appointed to the department shall, before entering upon his/her duties, make and subscribe to the oath of office, sign an agreement to abide by the rules and regulations as they are or may be established, and be subject to any penalties imposed by the Fire Commissioner for violations thereof.

\*\*\*

18.44   The following offenses are specifically forbidden:

  \*\*\*

  (j)   Conduct prejudicial to good order.

  \*\*\*

(m)   Untruthfulness or willful misrepresentation in matters affecting the department or its employees.

Jt. Ex. 15

## PERTINENT ORDER

## HEADQUARTERS, FIRE DEPARTMENT
## GENERAL ORDER NO. 49

### 1.   SUSPENSION

In accordance with the authority contained in General Laws, Chapter 31, Section 41, of the Commonwealth of Massachusetts and the provisions of Section 20.10 of the Rules and Regulations of the Boston Fire Department, the following named member is hereby suspended without pay:

Firefighter James P. Riley, of Tower Ladder 10, for four (4) tours commencing 0800 hours, October 19, 2023 and continued to 0800 hours, October 23, 2023 for violation of Boston Fire Department Rules 18.44 (j) and 18.44 (m).

This suspension was issued for the good of the Department and the Fire Service.

Jt. Ex. 6

## FACTS

The City of Boston (City) and the Boston Firefighters Union, Local 718, IAFF (Union) are parties to a collective bargaining agreement (CBA) effective July 1, 2017 to June 20, 2021. Grievant, who is 47 years old, is a firefighter who has been employed by the City of Boston's Fire Department (BFD) for 17 years.  He is currently assigned to Rescue 2, located in the firehouse at Egleston Square, Roxbury.  He has been at that station since he was transferred on January 1, 2024. When first employed, Grievant  worked for 5 years at the firehouse at 746 Centre Street, Jamaica Plain, and then for about 6 years was assigned to Headquarters where he was an EMS coordinator for 1 year and worked in the Logistics & Procurement Office for 5 years.  Grievant then transferred back to the Jamaica Plain firehouse and worked there until his transfer to Egleston Square on January 1, 2024.  The record evidence shows that Grievant attended the BFD Fire Academy and

on October 30, 2007, signed for and agreed to comply with the Frie Academy Rules and Regulations.   Included in those Rules and Regulations were Rule 1.12, which stated, RULES/REGULATIONS, GENERAL ORDERS AND SPECIAL ORDERS – Recruits shall be held strictly accountable for remaining aware of and following any Department Rule/Regulation, G.O. and/or S.O" and Rule 1.13, which stated, "RULE 18.44 – Recruits will be held strictly accountable for non-compliance with the requirements of Rule 18.44." According to Grievant's testimony, he has been a resident of West Roxbury for the past 20 years, living in the same house.  He lived in Hyde Park for a short time before that, and grew up in West Roxbury.  Apparently, he has never lived in Jamaica Plain.

At issue in this matter is Grievant's action vis-à-vis complaining about the condition of the apron and sidewalk ramps in front of the firehouse at 746 Center Street, Jamaica Plain.  Grievant testified that he had spoken to Captain Michael Moran, his Company Commander, about the condition at least a dozen times.  He also testified that Moran reported the issue to the Boston Fire Department (BFD) Facilities Division, and had shown him e-mails he had sent.  The documentary evidence shows the extent of the BFD awareness and the actions it took:

1. April 21, 2021, Morgan sent an e-mail, with pictures attached, to Joanne Callahan and Joseph Mayo, copying Joseph Minehan,[1] stating that the apron in front of E-28[2] was in need of repair and asked to have it fixed, also stating that it was "starting to cause problems with wheel chairs/strollers crossing our property."

2. On February 11, 2022, Callahan sent an e-mail to Moran and Gina Gould and Greg Mullen of R. Mullen & Associates, asking for a quote for the repair.  The same day Mullen responded that he was on it, and Moran then sent an e-mail back to Mullen,

---

[1]    Unless otherwise noted, the recipients of the following e-mails were apparently employees of the BFD, but their titles were not noted in the e-mails and there was no testimony identifying their titles.
[2]    This is the firehouse at 746 Center Street, Jamaica Plain.

copying Callahan, Gould and Joseph Walsh stating, "Great, thank you. Please let me know if you need anything on our end." Apparently Callahan responded with a thank you to Mullen and a response to Moran stating, "Will do."

3. On March 20, 2022, Moran sent an e-mail to Callahan, copying Mullen, Gould and Walsh, with pictures, stating "Following up on this. The holes are getting bigger." Mullen replied that he had submitted quotes for two options and was waiting for a purchase order for one of them. Moran then replied, "Great, thanks for the update!"

4. Later in the evening of March 20, 2022, Moran e-mailed BFD-Engine 28 and BFD-Tower Ladder 10 companies stating that the BFD was aware of issues with the front apron, that there were several quotes in, and that they were waiting to see whether they were going to go forward with concrete or asphalt. He also directed firefighters to make sure a cone was covering a large hole "between C7 and TL 10."[3]

5. On June 16, 2022, Moran e-mailed Callahan, copying Mullen, Gould and Walsh, and adding Richard Paris, stating, "While at the Engine 28 firehouse (covering for the day due to the PGA tour) a child fell and scraped his knee while walking on the broken concrete apron. Do we have any update on the apron repair?"

6. On April 20, 2023, Moran e-mailed Patrick Lee, BFD Facilities Director, asking whether there was any progress on two big projects for the Engine 28 firehouse, including the apron issue and the purchase of a replacement generator, the latter which is not germane to this arbitration. Moran stated he had been told the front apron was out for bid, and asked it there was any progress/timeline on it.

---

[3]    There is no evidence in the record regarding what "between C7 and TL10" means.

7. On April 21, 2023, Lee responded he had raised both issues with the BFD Budget Department. In his e-mail, Lee stated, "Unfortunately, where we are in the budget cycle, I don't have this in my operating budget. You are among 3 or 4 houses that need new generators and of many that need apron work. I am putting together two packaged projects that will address both these department wide issues to be submitted into the upcoming budget cycle."

8. On April 26, 2023, Moran responded with his thanks for the update.

On September 26, 2023, because no repairs had been made, Grievant sent an e-mail to Jascha Franklin-Hodge, Chief of Streets, Transportation, and Sanitation for the City Boston, from his Union e-mail. He copied the "311 supervisors", and Union President Sam Dillon. According to Grievant, he sent the e-mail while he was off duty, from his Union e-mail address, and he spoke to Dillon first.[4] Grievant testified that he sent it in order to get the issues addressed, and he took the pictures that he attached. He found Franklin-Hodge's e-mail address on the City's website.

The text of the e-mail is as follows:

Mr. Franklin-Hodge

I am writing you to ask for assistance with an ongoing issue in front of the firehouse at 746 Center st JP. The sidewalk and handicapped ramps have been marked up for replacement by the city since the summer of 2022. To date there have been some hot top placed to help ease the issue but not permanent resolution. Most, if not all, of the ramps going down Center st were repaired and replaced last summer by the city.

As a firefighter who proudly works in the neighborhood and spends time outside the firehouse interacting with the constituents we are constantly asked when this issue is going to be resolved. We have no answer and can only direct them to make a 311 complaint.

I strongly believe the is a safety issue for the citizens and guests who walk by here on a regular basis. Is the city going to wait till someone is injured before resolving this public safety issue?

---

[4] Dillon was present at the arbitration hearing, but was not called to testify.

Please see attached photos taken recently for reference.

thanks
  Jim

Jim Riley
Boston Firefighters Local 718
Executive Board Division 2

Underneath his name Grievant also added a phone number and his Union e-mail address.

Grievant testified that the handicap ramp in front of the firehouse and the apron or driveway were both in disrepair and had been for several years. Members of the public complained about the safety hazards, which Grievant stated were also safety hazards for firefighters. Apparently on some occasions firefighters had put out cones and had also reported some injuries to the public, including falls and a carriage getting stuck. Grievant testified on cross-examination that he personally did not see any falls, injuries or carriages getting stuck. According to Grievant, although he had spoken to Moran, who was the next person up in his chain of command, at least a dozen times, there had been no resolution. Grievant stated that Moran never told him to fill out any form or write to the Chief of the Streets. Grievant also stated that he knew the Chief of the Streets was a cabinet position and, that that position was not within his chain of command. Grievant testified that he was aware Moran had reported the ramp and apron issues to the Facilities Division and that Moran showed him the e-mails he had sent. Grievant testified that he understood the apron/driveway was the BFD's responsibility, but that the road and sidewalks are public ways. According to the testimony of Rodney Marshall, Chief of Operations Support, BFD, both the apron in front of the firehouse and the handicap ramp that is part of the apron are the property of the BFD. Marshall was aware that Grievant had reported the ramp and apron issues to Moran, and also testified that although Moran had reported the condition issues they had not yet been fixed because of budgetary constraints. When asked why he did not use the City's 311 system for

reporting non-emergency issues, Grievant stated he did not because there had been multiple complaints and no resolution.  He also stated that firefighters had told members of the public to report the issues through that system, but he did not know whether any people had made reports.

On September 27, 2023, Franklin-Hodge forwarded Grievant's e-mail to him to Paul Burke, Fire Commissioner and Chief of the BFD.  Fire Commissioner Burke provided the e-mail to Marshall, who asked Christopher Burke, Deputy Chief for the Personnel Division, BFD, to investigate.  In his e-mail, Marshall stated, with respect to Grievant, "He kind of threw the Comm under the bus."  Deputy Chief Burke then asked Michael Doherty, Deputy Chief, Division 2, Group 1, BFD, to investigate because Grievant was under his command.  Doherty testified that he met with Grievant on September 28, 2023, and that Grievant said he did not need Union representation.

According to Doherty's testimony and the Form 5A on which he reported the results of his investigation [Jt. Ex. 10], Doherty asked Grievant why he did not go through the chain of command.  Grievant replied that he had done so on numerous occasions with no resolution, and that he sent the e-mail because of daily complaints the firehouse received from citizens in the neighborhood about when repairs would be made.  Grievant also said he is a resident of the area. Doherty testified that he pointed out to Grievant he did not submit the e-mail that way.  In both his testimony and Form 5A Doherty noted Grievant said he should not have used his Union title. Once he completed his investigation, Doherty sent his Form 5A up through the chain of command and did not have anymore involvement with the investigation.

With respect to Doherty's investigation, Grievant testified that Doherty came to the firehouse and took Grievant up to the chief's office.  They were the only two in the room.  Doherty told him Personnel had said to talk to him and Doherty mentioned the chain of command.  Grievant said he sent his e-mail outside of work and in his capacity as a Union official.  Grievant also

testified that he did not ask for Union representation.  On cross-examination, Grievant stated that he did not recall saying he should not have used his Union title.

With respect to prior discipline, the record evidence shows Grievant received an Official Reprimand on October 25, 2022, submitted by Moran, for a violation of Rule 18.44(j) of the BFD's Rules and Regulations, *i.e.*,  Grievant ordered and received 16 tech rescue lockers without using the chain of command.  [Jt. Ex. 13]  According to the Form 5A Grievant submitted on October 22, 2022, he did not know his ordering the lockers was an overreach on his part.  Grievant also stated that he thought it was in the best interest of the members of the house, but that going forward he would strictly adhere to the chain of command.  [City Ex. 3]  According to the Form 5A submitted by Training Division Deputy Chief Gerard Viola, who met with Moran, Grievant's immediate supervisor, about the incident, Moran only became aware of the lockers when he received notice that they were being delivered.  Moran spoke to Grievant at the time and was assured this would not happen again.  Viola informed Moran that members of his staff would retrieve the 16 lockers later in the week of their meeting.  [City Ex. 2]

As a result of the investigation concerning Grievant's e-mail to Franklin-Hodge, Deputy Chief Burke signed an official reprimand and notice of suspension, which stated that Grievant was in violation of Rules 18.44(j) and 18.44(m), and specified a four (4) tour suspension.  [Jt. Ex. 4 & Jt. Ex. 5]  On October 12, 2023, a General Order of suspension was issued by Fire Commissioner Burke.  [Jt. Ex. 6]  Because Grievant appealed and requested a hearing [Jt. Ex. 7], Deputy Chief Burke scheduled one for October 27, 2023.  [Jt. Ex. 8]  Marshall acted as hearing officer and Deputy Chief Burke presented the case against Grievant.  On October 30, 2023, Marshall submitted his findings to Fire Commissioner Burke, in which he stated that he had determined the evidence was sufficient to find Grievant violated both rules, and that the discipline was fair and

consistent.  [Jt. Ex. 11]   In a letter to Grievant dated October 30, 2023, Fire Commissioner Burke upheld the official reprimand and four (4) tour suspension.  [Jt. Ex. 12]

On November 8, 2023, the Union filed a grievance on behalf of Grievant asserting that Grievant's 4-tour suspension was not issued in accordance with the CBA, the BFD's Rules and Regulations, or the Code of Progressive Discipline.  [Jt. Ex. 2]   A Step 3 hearing was held on December 4, 2023 before Hearing Officer Arshneel Kaur.  According to Kaur's Step 3 Decision, the Union argued the evidence did not show threats or intimidation, that the e-mail to the Chief of the Streets accurately reported the state of repairs, and that Grievant was acting within his capacity as a Union representative.  Kaur found that Grievant violated Rule 18.44(j) for deviating from the established chain of command and directly engaging the Chief of Streets to address the issue of unresolved repairs to the sidewalk and handicap ramps at the Jamaica Plain firehouse.  He also found that Grievant was not in violation of Rule 18.44(m) because he did not communicate any misinformation.[5]  Finally, Kaur found the BFD had just cause to issue a four (4) tour suspension. [Jt. Ex. 3]  The Union subsequently filed a Demand for Arbitration with the American Arbitration Association, and the matter now comes before this Arbitrator for decision.

## POSITONS OF THE PARTIES

### City

The City contends the only issue before this Arbitrator is whether it had just cause under the parties' CBA to discipline Grievant for sending his September 26, 2023 e-mail to the Franklin-Hodge.  Because the BFD is a paramilitary organization it has established rules concerning communications and responsibilities, including the requirement to report up the chain

---

[5]    I note that the Hearing Officer's Decision makes no mention of the allegation of threats or intimidation regarding Grievant's e-mail to the Chief of the Streets, and upheld a violation of Rule 18.44(j) on the basis of Grievant having deviated from the established command, as well as his familiarity with that protocol because of his prior discipline for breaking the chain of command.

of command. All members of the BFD, including Grievant, take an oath to uphold its established Rules and Regulations.  The failure to adhere to the chain of command is conduct that is detrimental to good order in violation of BFD's Rule 18.44(j).  As such, the chain of command must be followed in all situations, emergency and otherwise.  It is impossible to manage a paramilitary organization and maintain discipline if the chain of command can be bypassed.  Under the Rules, Grievant was required to report the apron and ramp issue to Moran, his Company Commander, and leave it to Moran to handle the matter.  By sending his e-mail, Grievant undercut Moran and every other officer in his chain of command, including the Fire Commissioner.

Even if Grievant's complaint to Franklin-Hodge was regarding a defect in the sidewalk, *i.e.*, a public way, rather than the firehouse apron, pursuant to Rule 18.19 of the BFD's Rules and Regulations, Grievant was required to report those concerns up the chain of command by promptly informing his immediate superior.  Grievant's e-mail was disrespectful as it implied others were not doing their job.  Had Franklin-Hodge not contact the Fire Commissioner about Grievant's e-mail the Fire Commissioner would not have known of its existence because Grievant had not been copied him.

The City also argues Grievant was disciplined for going outside of the chain of command, not for engaging in free speech.  For a public employee to claim his actions are protected by the First Amendment he must establish that (1) he was speaking "as a citizen on a matter of public concern, (2) his interests as a citizen, commenting upon matters of public concern outweigh his employer's interest in promoting the efficiency of the public services it performs through its employees, and (3) the protected expression was a substantial or motivating factor in the adverse employment decision.  Here, Grievant sent his e-mail as a firefighter and a Union Executive Board Member, not as a private citizen.  Where a public employee does not speak as a citizen, he has not

First Amendment cause of action based on his employer's reaction to the speech.  The U.S. Supreme Court, in <u>Garcetti v. Ceballos</u>, held that there is no First Amendment protection, and the <u>Pickering</u> balancing test is not applied when the public employee makes statements related to their official duties, even if those statements are about matters of public concern.  Under the BFD's Rules and Regulations, Grievant had a duty and responsibility to raise concerns regarding defects in public ways to his immediate supervisor within the chain of command.  In fact, Grievant had no connection to or interest in the sidewalk outside the firehouse other than through his job.  Grievant testified that he does not live in the Jamaica Plain firehouse neighborhood, but rather, in West Roxbury, miles from the firehouse.  Nor did he have any first-hand knowledge of any problems with the firehouse apron.  He was aware of members of the public complaining through accounts from co-workers, seeing the e-mails Moran showed him, and receiving the all-staff e-mail from Moran.  Grievant's concern for the conditions in front of the Jamaica Plain firehouse arose from his official duties.  In addition, Grievant's e-mail was an internal communication to his employer, the City of Boston, rather than through channels available to citizens generally.  Furthermore, there was a citizen analogue proven because the Union presented no evidence that anyone filed a single 311 complaint regarding the firehouse sidewalk.  Because Grievant's comments involved internal complaints about the management of the BFD that did not rise to matters of public concern he has no First Amendment claim, and the BFD had the right to regulate the time, and manner of Greivant's communications to City officials.

Finally, the City argues that even if Grievant as a public employee had a First Amendment right, which its says the Grievant did not, the Union would bear the burden of demonstrating his protected expression was a substantial or motivating factor in the adverse employment decision. In this case,  Grievant was disciplined because he spoke as a BFD firefighter outside his chain of

command,  not because he complained about sidewalk defects. If he had made the same complaint through his chain of command, he would not have been disciplined.  Furthermore, this was the second time Grievant overreached and went outside his chain of command.  For these reasons, the City had just cause to discipline Grievant, ther3efore, the Union's grievance should be dismissed.

**<u>Union</u>**

The Union argues the City lacked just cause to discipline Grievant because Grievant followed the chain of command and because his speech was protected.  Prior to sending his September 26, 2023 e-mail Grievant followed the chain of command regarding his safety concerns. When that went nowhere he reached out to Franklin-Hodge in his capacity as a Union member and private citizen, therefore, he did nothing wrong.  The BFD's Rules and Regulations define the chain of command and "the forwarding or transmitting of oral or written communications from the point of origin, through each ascending or descending level of authority."  Grievant had been complaining to his Captain for nearly two years about his station's conditions to no avail and also elevated complaints he received from citizens in the community who passed the firehouse on a regular basis.  His Captain made Grievant aware that the complaints to the BFD's Facilities Department had gone nowhere with conditions worsening and becoming more dangerous to firefighters and civilians.  Because Grievant knew his Captain had met a dead end in resolving the complaints Grievant had reached an end to what he could do as a firefighter.  Because of his prior discipline over ordering lockers for his station Grievant knew he could not go over his Captain's head and contact another officer in the BFD, so he did not.  In fact, pursuant to Rule 18.19 Grievant was only required to notify his Captain, who Grievant knew had escalated the issue to the Facilities Division – the proper chain of command.  Furthermore, Grievant understood the sidewalk in front of the firehouse is a public works property, not a BFD property.

The Union also contends the City lacked just cause to suspend Grievant because his e-mail was protected speech under Massachusetts collective bargaining law, G.L. c. 150E as it was sent in his capacity as a Union officer about hazardous working conditions.  Grievant sent his e-mail while he was off duty, from his Union official e-mail, and sent in collaboration with his Union to shed more light on unsafe working conditions, to get help for the firefighters and the constituents living nearby.  The Union asserts that the e-mail was a concerted activity, therefore, even in the absence of anti-union animus, the City violated G.L. c. 150E by taking an adverse action against Grievant while he engaged in protected activity, particularly addressing workplace concerns such as working conditions, misconduct and safety.  Once an arbitrator analyzes whether the speech is concerted and thus protected activity, the analysis turns to whether the speech was "unlawful, volent, a breach of contract, indefensibly disloyal to the employer or disruptive of the employer's business" so that it loses its protection as concerted, protected speech.  To do so, a four-prong test applies: the place of the discussion; the subject of the discussion; the nature of the outburst; and whether the misconduct was provoked by the employer's unfair labor practices.  Speech in a private setting, off work hours, which was not observed by others, and did not undermine workplace discipline weighs in favor of protection.  In addition, when the subject matter involves continuing dialogue of concerns over terms and conditions of employment an individual speaking in his capacity as a union member weighs in favor of protection.  An outburst such as a non-physical e-mail that is spontaneous and brief and unaccompanied by physical harm also weighs in favor of protection.  Whether the outburst was provoked by the employer's unfair labor practices does not depend on whether the employee filed an unfair labor practice charge, but rather on whether the employer's conduct evinced an intent to interfere with protected rights.  In this case, Grievant's speech was clearly made on behalf of the Union for the purpose of addressing a safety

concern for his entire membership of firefighters and the civilians they serve.  The City failed to establish that his speech lost protection due to being "unlawful, violent, a breach of contract, indefensibly disloyal to the employer or disruptive of the employer's business."  In addition, Grievant spoke with his Union President before sending the e-mail and did so from his Union e-mail address with his Union Board position in the signature.  The fact that Grievant spoke to Moran about the deteriorating sidewalks evinces the required group action that he was speaking on behalf of multiple members about an ongoing issue related to employment.  The City did not offer any evidence of physical harms or threats of harm.  Furthermore, the e-mail thread was not within the public view and was a private communication between a Union member and a public official responsible for responding to the inquiries of his constituents.  Grievant's single instance of sending the e-mail could be argued to have been provoked by the City's lack of action and because Grievant subjectively believed Franklin-Hodge had the power to assist with this "public safety issue."

In the alternative, should this Arbitrator not agree that Grievant's e-mail was protected Union speech, the Union contends it should be afforded First Amendment protection because it was private speech about a matter of public concern.  Grievant's e-mail was on a subject for which the community manifested a legitimate concern and it suggested Grievant's intent to contribute to the public discourse.  Furthermore, because it was not limited to internal personnel procedures it would more likely weigh in favor of finding the matter was of public concern.  The public concern is evidenced by the fact that citizens were getting injured by deteriorating sidewalks and contacting the City's 311 hotline.  The Union argues Grievant's "subjective intent" was to add to the already public discourse because he had strong beliefs that the deteriorating sidewalk posed a

public safety issue. In addition, the subject was not limited to internal personnel matters because any member of the public walking on the sidewalk would be affected.

The Union also contends Grievant's e-mail was not sent pursuant to his official duties, but rather as a private citizen, therefore, it should be afforded First Amendment protection. The factors the Union cites are: …whether Grievant was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether Grievant spoke at his place of employment; whether the speech gave objective observers the impression that his speech derived from special knowledge obtained during the course of his employment; and whether there is a so-called analogue to the speech. The Union argues all factors weigh in favor of finding Grievant's "speech" was not made pursuant to his official duties, but rather was made in his capacity as a private citizen. First, there is no indication in the record that Grievant was commissioned or paid to send the e-mail. Second, defective sidewalks are not ordinarily within the scope of a firefighter's duties. Third, Grievant sent the e-mail while he was off duty. Fourth, Grievant was "uniquely qualified" to comment on the matter because the defective sidewalks were causing ongoing issues for civilians and his union membership. The fact that Grievant identified himself as a firefighter in his e-mail is insufficient to support a conclusion that he was acting in is professional capacity. Grievant's knowledge of the deteriorating sidewalk began in April of 2021, therefore, it was not dependent on his knowledge of the 2022 e-mail exchange between Moran and the BFD Facilities Division. In addition, as a citizen of Boston, Grievant could very well have come across the deteriorating sidewalk in his personal life as a resident. Fifth, there is a "citizen analogue" to Grievant's e-mail to Franklin-Hodge. Although citizens may also use the 311 hotline to report defects, and it may be unusual to reach out to Franklin-Hodge directly, they are not prevented from doing so by a rigid chain of

command because Franklin-Hodge's e-mail address is publicly available.  Grievant's speech was "analogous to the speech of other citizens in the community troubled by" the deteriorating sidewalks as evidenced by the numerous complaints submitted to the 311 hotline and by Grievant himself.  For these reasons, the Union asserts Grievant sent his e-mail in his capacity as a private citizen on a matter of public concern, therefore, it was protected by the First Amendment.

Finally, the Union argues Grievant's prior written warning, as well as a prior allegedly comparable case involving another firefighter, do not provide grounds for suspending Grievant. This suspension was the first Grievant received in is 16 yeas of employment.  With respect to his previous written reprimand, Grievant was disciplined because he reached out to another captain in BFD Headquarters and ordered 16 new tech rescue lockers to replace the deteriorating ones in his firehouse.  The Union also asserts Grievant never went through with purchasing the lockers, however, he received a written reprimand for deviating from the chain of command.  In this instance, Grievant did not circumvent his captain and speak to another captain outside of his firehouse about safety concerns, but rather, after following his chain of command for two years, chose to try a different route to get redress by contacting the City about a safety concern in his capacity as a Union officer while off-duty.

With respect to the 2018 discipline of another firefighter, the disciplinarian was required to fill out an extensive checklist to ensure that discipline was "objective and well informed."  That checklist was not present in Grievant's file, therefore, it is reasonable to conclude that Grievant's discipline was not "objective and well informed."  Even aside from the procedural differences, the other firefighter's behavior was clearly substantively distinguishable.  That firefighter had been disciplined and counseled in the past for minor incidents related to the same type of unacceptable behavior, and had received a 2-tour suspension for the last similar infraction before receiving a 4-

tour suspension.  The only similarity between that case and Grievant's is the length of the suspension.  For all the above reasons, the Union's grievance should be sustained, Grievant's discipline reversed and expunged, and Grievant be made whole for lost pay, overtime and details, and interest.

## DECISION

The issue before me is whether the City had just cause to discipline Grievant by issuing a 4-tour suspension for violating BFD Rule & Regulation 18.44(j) – conduct prejudicial to good order.[6]  Pursuant to this Rule, the City suspended Grievant because he failed to follow the chain of command.  The Union argues Grievant either followed the chain of command or was excused from doing so because his "speech" was protected, *i.e.*, (1) either he was acting in his capacity as a Union official, therefore, his actions were protected by M.G.L. c. 150E, or (2) his "speech" was private speech by a public employee about a matter of public concern protected by the First Amendment, or (3) the e-mail he sent was not pursuant to his official duties, but rather as a private citizen with First Amendment protections. In matters of discipline the employer bears the burden of proving just cause.  It is not necessary to reach the Union's arguments unless I first determine that the City has met its burden of proving just cause to discipline Grievant.  Based on the record evidence, including all testimony and documents, I find that the City has sustained its burden.

In arbitration cases addressing violations of rules, it is commonly recognized that the rule relied upon must be reasonable, consistently applied and enforced, and widely disseminated. Although the Union has not argued that Rule 18.44(j) is unreasonable, unknown, or inconsistently applied and enforced, I find the record evidence would refute any such position.  The record

---

[6]    As stated in the Facts, *supra* page 11, the BDF Hearing Officer found Grievant did not violate Rule 18.44(m).

testimony makes clear that the BFD is a paramilitary organization, which relies on a clear chain of command. There is no evidence in the record to undermine the necessity of a chain of command. In fact, when Deputy Chief Burke requested that Doherty investigate the matter underlying Grievant's e-mail to Franklin-Hodge, he indicated that Grievant's actions of having gone outside of the BFD had potentially embarrassed the Fire Commissioner. In addition, Rule 18.17 states, "A member shall promptly notify his/her immediate superior of any of the following which he has personal knowledge of, or with which he is in any way connected" and in subsection (b) lists "Defects in apparatus, equipment or other department property or damage to same," which is further evidence of the importance of the chain of command to the BFD. Furthermore, as stated above, Rule 18.44 concerns offenses that are specifically forbidden, including (j) conduct prejudicial to good order. Having been provided with no evidence to the contrary, I conclude, based on the record as a whole, that the BFD's Rules and Regulations concerning the chain of command are reasonable.

The record also shows that BFD employees, including Grievant, were well aware of the BFD's rules regarding following the chain of command. First, on October 30, 2007, while Grievant was attending the BFD Fire Academy, he signed for receipt of the Fire Academy Rules & Regulations, which included a Rule requiring being aware of and complying with the BFDD Rules and Regulations, and a Rule specifically stating that recruits would be held strictly accountable for non-compliance with Rule 18.44. Second, with respect to the matter of the problems with the Jamaica Plain firehouse apron and ramp, Grievant testified that he had reported the matter to Moran, his immediate superior, a number of times, demonstrating his ability to follow the chain of command. Third, Grievant testified that Moran had shown him the e-mails he had sent regarding the apron/ramp issue. In addition, Grievant was a recipient of Moran's March 20,

2022 company-wide e-mail, which informed the firefighters that BFD was aware of the issues with the front apron, that there were several quotes submitted, and that the BFD was waiting to see if it was going forward with concrete or asphalt.  This demonstrates that Grievant was aware his own superior was following the proper chain of command.  The only reason Grievant gave during his testimony for why he deviated from following the chain of command was because he had been going to Moran since April of 2021, but there had been no resolution.  Fourth, Grievant acknowledged during his testimony that the Chief of the Streets was a cabinet level position, which was not within his chain of command.  Finally, eleven months before, on October 25, 2022, Grievant had received a written reprimand for violating Rule 18.44(j) by ordering and receiving 16 tech lockers without using the chain of command.[7]  In fact, although the Form 5A Grievant submitted prior to receiving that written reprimand stated he was not aware that he had overreached, he also stated that going forward he would strictly adhere to the chain of command. Based on the record evidence, I conclude that Grievant had received, was aware of, and knew he was expected to follow the BFD Rules and Regulations concerning the chain of command.

With respect to application and enforcement, including this matter, Grievant was disciplined twice for violating Rule 18.44(j) for failing to follow the BFD chain of command.  The City also provided documentation of one other instance where a firefighter was disciplined for violating BFD Rule 18.44(j) by bypassing his chain of command.  It appears the Union is arguing that because the other firefighter's discipline contained a checklist for the person imposing discipline to see if his decision was objective and well informed, and no such list was produced with respect to Grievant, Grievant's discipline was not.  In addition, the Union asserted that the other firefighter's behavior was substantively distinguishable, and that he had been counseled and

---

[7]      Contrary to the Union's assertion that the lockers were never received, the record evidence shows the lockers were delivered and had to be retrieved. [City Ex. 2]

disciplined in the past for minor incidents related to the same type of unacceptable behavior, including receiving a 2-tour suspension before receiving his 4-tour suspension. Be that as it may, the record evidence shows that the City has previously imposed discipline for violating the same Rule by failing to follow the chain of command.[8] Based on the above, I conclude that the City has sustained its burden of demonstrating that Grievant violated Rule 18.44(j) by failing to follow the chain of command.

As stated above, based on the evidentiary record as a whole, the Employer had just cause to discipline Grievant for violating Rule 18,44(j) by failing to follow the BFD's chain of command. The Union contends, however, that even if Grievant did not follow the chain of command, circumstances exist that would support the conclusion that Grievant should shielded from discipline. The Union has espoused three theories. First, it contends Grievant's e-mail was protected speech under Massachusetts collective bargaining law, by M.G.L. c. 150E because he e-mailed Franklin-Hodge in his capacity as a Union official. The facts that Grievant sent the e-mail using his e-mail address, copied the Union president, included his Union title after his signature, and identified himself in the body of the text as a firefighter are insufficient to clothe his e-mail in the protection of 150E. Under M.G.L. c. 150E, public employees have the right to engage in concerted activity for the purpose of collective bargaining or other mutual aid or protection, free from interference, restraint or coercion. The language of Grievant's e-mail, however, belies a claim of protected Union speech. The clear subject of Grievant's e-mail was apprising Franklin-Hodge of a safety issue for citizens in the neighborhood, not for the firefighters who worked in the firehouse. In his mail, Grievant wrote that firefighters "... are constantly asked [by members of the public] when this issue [sidewalk and handicapped ramps in front of the firehouse] is going to be repaired." Grievant noted that the firefighters had no answer for them and were directing the

---

[8]    With respect to the length of Grievant's suspension, I address that below.

public to make a 311 complaint. Grievant also wrote, "I strongly believe the [sic] <u>is a safety issue</u> <u>for the citizens and guests who walk by here on a regular basis. Is the city going to wait till</u> <u>someone is injured before resolving this public safety issue?</u>" [emphasis added]  Nowhere in Grievant's e-mail does he mention or assert that he was advocating for firefighters' mutual aid or protection, terms or conditions of employment, or other working conditions such as the resolution of a safety issue for firefighters working at the firehouse. Because Grievant's e-mail contains no evidence of protected concerted activity on behalf of the firefighters working in the Jamaica Plain firehouse, he cannot now assert that his Union title shields him under M.G.L. c. 150E from what would otherwise subject a firefighter who is a non-Union officer to discipline. [9]

Second, the Union asserts that even if this Arbitrator finds Grievant's e-mail was not protected Union speech, it should be afforded First Amendment protection because it was private speech by a public employee about a matter of public concern. Under some circumstances, once the subject of the speech is found to concern a matter of political, social or other concern of the community, the employer must prove that the speech was disruptive, demoralizing, or otherwise injurious to the effective carrying out of its governmental functions in order for the employee to lose his First Amendment protection. That balancing test is never reached, however, if the subject of the public employee's speech is part of the public employees' routine duties.   Based on the record as a whole, I find that is the case. First and foremost, I have already found that the apron and ramp in front of the firehouse, which was BFD property, was properly subject to being reported up the chain of command as part of Grievant's duties as a firefighter. Assuming, arguendo, Grievant's position that the condition of the sidewalk and handicap ramp he wrote about to

---

[9]        Grievant's uncorroborated testimony was that he spoke to the Union resident before sending the e-mail. As noted in footnote 4 above, although Union President Dillon was present during the arbitration hearing, he was not called to testify. In any event, even assuming Grievant did speak to Dillon before sending the e-mail, the fact remains that the text of the e-mail concerned members of the public and not the firefighters.

Franklin-Hodge concerned a defect in a public way, which based on the record evidence is not likely, his obligation to report on that condition was part of his routine duties as a BFD firefighter. According to the BFD Rules and Regulations, Rule 18.19, "If a member observes any street or highway condition liable to cause delay or accident to apparatus, or if he knows of any occurrence or condition of affairs which in the public interest should be communicated to another public department, he shall promptly inform his/her immediate superior thereof...." It is clear, therefore, that even assuming Grievant was correct that the conditions in front of the firehouse concerned a public way, it was still part of his responsibility as a firefighter to report that to his immediate supervisor.[10] For these reasons, I find the Union's claim that Grievant's e-mail should be afforded First Amendment protection because it was private speech by a public employee about a matter of public concern fails.

Finally, the Union argues that Grievant's e-mail was not sent pursuant to his official duties, but rather as a private citizen, therefore, it should be afforded First Amendment protection. I have already determined that, no matter how one characterizes the area in front of the firehouse, Grievant, as a BFD firefighter, had the responsibility as part of his duties as a firefighter to report the condition of that area up the chain of command. That conclusion stops further inquiry into the matter because when public employees make statements pursuant to their official duties they are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.

Having determined that the City had just cause to discipline Grievant, and found no theory proven that would insulate Grievant from discipline, it remains for me to determine whether a 4-tour suspension is supported by the facts of this case. According to the BFD's Rules and

---

[10] Franklin-Hodge, s Grievant admitted during his arbitration hearing testimony, was not his immediate supervisor or even within Grievant's chain of command.

Regulations, Chapter 20, Rule 20.9, the BFD adheres to a Progressive Discipline Code.[11]  As a general rule, discipline should be corrective and should be administered in a consistent manner, *i.e.*, employees who engage in the same type of misconduct must be treated essentially the same unless a reasonable basis exists to vary the punishment.  According to the record, Grievant, who has been employed by the City for approximately 17 years, had one previous instance of discipline.  On October 25, 2022, he received a written reprimand for ordering and receiving lockers for his firehouse without using the chain of command, in violation of Rule 18.44(j), the same Rule for which he was disciplined in this case.  I note that in this matter, when the 4-tour suspension was initially imposed, Grievant was also found to have engaged in untruthfulness or willful misrepresentation in matters affecting the BFD, in violation of Rule 18.44(m).  Although at the Step 3 hearing the Hearing Officer determined that Grievant was not in violation of that Rule because his e-mail did not communicate any misinformation to Franklin-Hodge, the Hearing Officer still upheld the 4-tour suspension.  The record evidence also shows that the City previously disciplined another firefighter, under different factual circumstances, for bypassing the chain of command in violation of Rule 18.44(j).  According to the record evidence, that firefighter had been repeatedly coached/counseled over years for minor incidents related to his type of unacceptable behavior and had also received a 2-tour suspension for the last similar infraction before having a 4-tour suspension imposed.  In light of the above, I find a 2-tour suspension would comport with

---

[11]     I note neither party submitted into evidence a copy of that Code.

the concept of progressive discipline and accomplish the goals of employing discipline that is corrective and administered in a consistent manner.

Finally, I am not swayed by the Union's request to make Grievant whole for lost overtime and details. There is no evidence in the record that he lost such opportunities, therefore, any such award would be speculative at best. In addition, it is not customary for arbitrators to award interest unless there are special circumstances such as an employer's dilatory conduct or bad faith, or an unnecessary delay in the grievance process caused by the employer. Because there is no evidence in the record that such circumstances exist here, I decline to award interest.

## AWARD

The City had just cause under Article XVI of the parties' collective bargaining agreement to issue a 2-tour suspension, with letter of reprimand, to Grievant, Firefighter James Riley, for failing to follow the chain of command in violation of Rule 18.44(j).

The City is directed to reduce Grievant's discipline to a 2-tour suspension without pay and to change the letter of reprimand, Grievant's record, and all personnel files to reflect this change. The City is also directed to make Grievant whole for his lost wages.

Dated:  4/24/2025          _Beth Anne Wolfson_
                                           Beth Anne Wolfson, Arbitrator